The next case on the calendar today is number 21-668, Abromavage v. Deutsche Bank Securities. Mr. Goodstead, whenever you're ready. Again, it is up to you, but you may remove your mask when you speak. Thank you, Your Honor. You might start by telling us the proper pronunciation of your client's name. Your Honor, it's Neil Abromavage. Yes, Your Honor. Good morning, and may it please the Court. My name is Andrew Goodstead, and we represent the plaintiff appellant, Neil Abromavage. We respectfully request that this Court reverse the decision below and remand it back down to the District Court for trial for the following reasons. First, the District Court erred in determining that no material dispute of fact exists regarding whether the reasons provided by defendants for the adverse acts were pretextual, as well as for the related reason that the Court erred in determining that no material dispute of fact exists. What facts are in the record that the District Court didn't pay attention to? Well, Your Honor, there's a large number of facts that the District Court ignored. Well, just tell me three or four. Sure. I'm sorry, but I'm interested in facts that go to the issue of retaliation, facts that would prove that it was retaliation rather than a judgment on the merits of his behavior, his performance. Yes, Your Honor. So as the Court is aware, there are seven adverse acts that we claim were in retaliation for Mr. Abromavage's participation in a protected investigation. As this Court has made clear, the totality of the circumstances should be viewed and not viewed in a silo and individual acts, and that's what Judge Capone did. But I'll address them by act. And when you do, would you tell me what it has to do with retaliation? I'm having a little trouble figuring out how they prove retaliation or tend to prove retaliation rather than something else. Okay. So as the Court is aware, Mr. Abromavage engaged in protected activity in connection with an investigation of another investment banker at Deutsche Bank named Jason Grandiano. And shortly after Mr. Grandiano was terminated, in part because of Mr. Abromavage's participation, the litany- Grandiano? Grandiano. Grandiano, Your Honor. Yes, Your Honor. We know that Mr. Abromavage provided information about numerous racial slurs that Mr. Grandiano used towards South Asian, employees of South Asian descent. We know that Mr. Abromavage provided information regarding gender discrimination during the investigation. Why would they retaliate? I can't quite get my hands around the connection between what he did with respect to the investigation. And why would they retaliate against him for having participated in that? Your Honor, because the record is full of facts that demonstrate that the decision makers in each of the adverse acts were historically protecting Mr. Grandiano. He was part of the Old Boys Network? Correct. He was not only part of the Old Boys Network. He was from the same region of Canada as some of the decision makers. There's a litany of acts in the record that Mr. Grandiano had undertaken over the years. There's evidence in the record that states that would have resulted in immediate termination for cause on Wall Street where nothing happened to him. And our papers set forth all the different things and all the evidence of this protection. And Judge Caproni, I believe, misstated the premise and stated that just because they were friends with him doesn't mean that they would protect him. But it goes beyond that. There was actual protection when there was misconduct engaged in by Mr. Grandiano. But doesn't the fact that he was terminated show that the protection went only so far and then didn't really protect him? That Mr. Grandiano was terminated? Yes. Yes. Yes. I mean, certainly I think that they were left with absolutely no option other than to terminate. I mean, I think that there was a call that there's record evidence or record testimony on that there was a call related to the conclusions of the investigation where there were a whole host of reasons of why he should be terminated with legal on and HR on. And they were left with no option other than to terminate. However, after the termination, Defendant Mark Hantho, who's one of the decision makers here, had expressed remorse about having to terminate Mr. Grandiano as well as John Einenberg, who's also a decision maker in the case, actually threatened Mr. O'Brienbridge's partner and said, you should assume that I know everything that happened in the investigation. Mortara? He said that to Mortara? Correct. He said that to Jack Mortara, who was the other senior managing director, who was Mr. O'Brienbridge's partner, who also participated in the investigation that led to Grandiano's termination. So that's Einenberg, who said you should assume I know everything. Correct. But was he a decision maker in terms of Mr. O'Brienbridge's fate? He was a decision maker in terms of the move to a different position in FIG. He stopped that? He stopped the move, which was on its way, was almost accomplished? Correct. He stopped the move that was in motion and to which he was a supporter up until the Grandiano termination. So, all right, continue. Okay. Well, let me approach it this way. What's your response to the rationale that your client's revenues fell off pretty sharply in 2015? And that seems to me to be a fairly rational explanation for what happened. How is that protected? Right. So, Your Honor, the revenue drop-off has to be viewed in the totality of the circumstances. And that was one of the main problems with the district court's analysis. They took one factor espoused by defendants as for the reason and said, yes, that's exactly as you just stated, Your Honor. That seems like a valuable reason. However, if you look at the totality of the circumstances, after the Grandiano termination, there was a part of Mr. O'Brienbridge's business called SPACs. And for over 10 years, Mr. O'Brienbridge and Mr. Mortera were granted P&L credit for SPACs revenues. And it didn't matter. I know that argument. Even without the SPAC credit, though, his revenues were still lower in 2015, were they not? With the SPACs. He hadn't even been granted the credit for SPAC as he had historically. They were still lower. Correct. If you did get granted the SPAC revenue plus the revenue that he was actually apportioned, his revenues and the district court recognized that that would have been $40.2 million, which is similar to what his revenues were in 2013. And his bonus in 2013 and his bonus in 2014 were very similar. So the increase in revenue from 13 to 14 didn't result in an increased bonus. They said they had no money to give bonuses. They said they just didn't have the cash. Your Honor, that's what they claim now. However, they testified, Mark Hanford testified that he awarded a zero bonus because he was directed to by Jeff Owen, who at the time was the head of investment banking. And this was a verbal instruction that had, it's not reduced to writing. It is contradictory to Deutsche Bank policy. And, Your Honor, at the 11th hour, Jeff Bunzel, who's also in the same bonus pool, was granted an additional $562,000 towards his bonus. So if there was no money available, and neither Mr. Bunzel nor Mr. Hanford could explain, how was there money available to give Mr. Bunzel a $562,000 bump after Mr. Abramovich was dropped to zero? So your argument is that this changing rationale for the bonus not being given is a sign and is proof of pretext. Is that correct? That's precisely correct, Judge Fuller. However, it goes beyond just the shifting explanations. There's directly contradictory evidence in the record as to the reasons why the zero bonus was given. I see my time is up, but I'd like to answer a question. So in the record that I mentioned before, Mark Hanford testified that the only reason why he gave Mr. Abramovich a zero bonus was because of this directive from Mr. Erwin. And Mr. Hanford testified that he was surprised by it. It was the first time he's ever seen it in his investment banking career. Was this directive reduced to writing and wasn't part of the record? It was testified to by Mr. Hanford in his deposition. There was nothing in writing, nothing produced in discovery. Mr. Hanford testified that it was not in writing. The bank does not have a record of it. And he claims that that's the reason why he gave the zero bonus. But he was told to give 20 percent zeros. However, he didn't implement it. Even if the directive exists, which we think there's a material issue of fact whether it even exists, because Jeff Bunzel doesn't even mention it, even though it's such an extraordinary event in the bonus decision. Even if it exists, it was implemented only against Mr. Abramovich. He's the only managing director in the U.S. that received a zero bonus after supposedly Mr. Hanford was directed to give 20 percent zero bonuses. So that being said, not only was it the story shifted and the directly contradicting evidence, but at the time Mr. Abramovich was told what his bonus would be, this directive, this alleged directive, wasn't mentioned to him at no point. All of this was because he participated in the inquiries to the employee from Canada. That he participated in the investigation from the employee who was terminated, correct. How do – you've already been through this. Well, I think I share Judge Sack's concern. How have you shown but for causation? I mean, I think I'm hearing your arguments here, but there's still a pretty big gap between the things that you're alleging, even if we accept all of that and we're telling the truth. Your Honor, the way that we prove but for causation is exactly how the circuit has determined that it should be proved, through inconsistencies in the explanations, through implausibilities, through contradictions. And that is exactly how a plaintiff who doesn't have direct evidence of discrimination, because this circuit recognizes frequently that direct evidence of discrimination doesn't generally exist, the way to show but for is through these inconsistencies. And our papers highlight dozens of inconsistencies, all of which Judge Caproni accepted defendant's side of that story. None of which she accepted as true in the prima facie analysis, but did not accept them as true during her analysis on the third step of the burden shift when it comes to us to show pretext and but for. Thank you, counsel. We'll hear from Mr. Smith. Good morning, Your Honors. Cameron Smith for the defendant's appellees. If it may please the court, this is a straightforward retaliation case and the adverse actions have to be assessed against the undisputed facts, first among them that Mr. Abramovich's revenues and those of his group were in free fall. Abramovich doesn't allege that Judge Caproni misstated the summary judgment standard or applied the wrong law to- It was industry wide, wasn't it, that the revenues for this particular unit of the bank were in free fall? It was industry wide, wasn't it? Was it industry wide? There was, I mean, the Deutsche Bank, its FIG and its ECM business, not just Neil Abramovich's revenues were declining. However, while Mr. Abramovich would have himself or the court act as a super personnel department to look at other metrics and he asks the court to look at wallet share, for example. You know, what percentage of the business on the street did Deutsche Bank actually secure as the metric to evaluate his performance? It's undisputed that his own revenues and those of FIG were in free fall and that Deutsche Bank relied on those reasons in making the employment decisions that are at issue here. Did Deutsche Bank conclude that Mr. Abramovich was somehow incompetent in doing his job and that's why the revenue was falling? I don't think that the- He was bad at his job. I don't think that's at issue here, Judge Pooler, that they thought that he was bad at his job, but I think the facts are undisputed that his revenues were in free fall in 2015 and 2016 and he was given a good performance rating as opposed to a very good performance rating in 2015. Because of those declines in revenue, but also some other partnering issues that had been identified by his manager in his 2013 and 2014 reviews. What about the reassignment of the SPAC credit? Your adversary says that that itself seems to be part of the pretext. Yes, so with respect to Hackle's transfer to ECM, this was not retaliatory. It's undisputed that the decision to transfer Eric Hackle was made in March 2015, well before Abramovich's interview on May 19, 2015. Now, Mr. Abramovich claims that the decision to reallocate SPAC revenue occurred after he was interviewed, but he has no evidence that this was true. Nonetheless, Judge Caproni credited the assertion, but it doesn't preclude summary judgment because he has no evidence undermining the bank's reasoning for reallocating the SPAC revenue. Well, we just heard from opposing counsel that they had shifting rationales for no bonus. That sort of undermines their position, doesn't it? Well, shifting rationales could demonstrate impossibilities or contradictions. And the temporal proximity, which we haven't even talked about, is certainly a factor in Mr. Abramovich's case, isn't it? Yes, but if I could just answer the question about shifting rationales, there are no shifting rationales here. Jeffrey Bunzel and Mark Hantho gave consistent rationales that they considered qualitative and quantitative metrics regarding performance. They looked at FIG revenues. They looked at Mr. Abramovich's revenues. The evidence of supposed shifting rationales that Mr. Abramovich points to is that Jeffrey Bunzel didn't testify to Irwin's directive in his first day of deposition, but that's because he wasn't asked about it during his first day of deposition. And the fact that not literally 20% of individuals within ECM received a zero bonus, that the directive wasn't literally carried out, does not demonstrate evidence that the directive was never delivered. It's undisputed that other managing directors within ECM received zero bonuses. And Abramovich also can't show that Hantho and Bunzel retaliated against him in December 2015 by giving him a zero bonus, because when they made that decision, neither knew about his complaints in August or October 2015. There's undisputed evidence showing that the iterations of Abramovich's bonus had been declining well before, and the zero bonus decision was made at least by the early morning of December 3rd, 2015. Hantho didn't learn about the complaints until later that day when he was first interviewed as part of the Abramovich investigation, and Bunzel didn't learn about it. They knew about Abramovich's participation in the Guarandino investigation, right? I'm sorry, Judge Park, what was the question? They knew about Abramovich's participation in the Guarandino investigation. Yes, Judge Caproni credited that assertion that they knew about Mr. Abramovich's participation in the Guarandino investigation based on a line in the Abramovich investigation report, which was explained by Michelle Kirschenbaum's declaration that if they did know, they would know that his participation was minimal. And the fact of the matter is— That it was his testimony that was the direct cause of the ultimate conviction of Mr. Guarandino. Yes, but— Was that eye of the beholder evidence, or did the court or the group that investigated this person, did they say what they relied on in finding him obviously guilty of the offense? They did not—Chris Burdi and Joanne Smith did not identify Neil Abramovich as corroborating any of the allegations against Jason Guarandino. Did they write a report? I'm sorry? Did they write a report? They did write a report. Was it part of the record? The report was—yes, but it was not shared with Marcantho or Jeffrey Bunzel. What about Eidenberg, who says, you may assume I know everything that went on? Yes, Neil—Jeffrey Eidenberg was not a decision maker with respect to any decision regarding Neil Abramovich. There are too many inferential leaps that one must make to conclude that because he said that if he made this hearsay statement, that I know everything that's going on, means that there was an intent to retaliate against Abramovich. Abramovich was one of 14 people interviewed in an investigation involving over 20 allegations against Jason Guarandino, and he did not substantiate any of the key allegations regarding Jason Guarandino's behavior. So your argument is that it wasn't protected activity? Is that right? We do make that argument as an alternative basis to grant summary judgment on a de novo review. However, we don't think that it's necessary, given that Judge Caponi correctly concluded that the plaintiff had failed to demonstrate that any of Deutsche Bank's reasons were false or pretextual, or that retaliation was a but-for cause, that he did engage in protected activity during the Guarandino investigation. We appreciate that he—and concede that he engaged in protected activity when he himself complained of retaliation, but I think the plaintiff has a timing issue there because Antho and Bunzel didn't learn of that until December 3rd of 2015. There's no evidence that the supposed friendship between Antho, Bunzel, and Eidenberg suggests that they were— that they protected him or that they harbored retaliatory animus, and there's no evidence that Antho, Bunzel, or Eidenberg protected Guarandino. That's because people don't ordinarily say, because he testified against one of our guys. They don't put that in writing. They don't say it where it could be reported, but we're allowed to draw inferences if it looks like that's what happened. Are we? Allowed to draw inferences, for example, from temporal proximity at the prima facie stage. However, I think that appellant here has failed to present evidence that Deutsche Bank's reasons were false and pretextual, and that is his burden, to establish falsity and pretextual reasons and that retaliation was a but-for cause. And all that he can point to is speculation and conjecture that because these people were friends, because they were Canadian, that they must have been motivated to retaliate against him or some supposed pattern of protection. But the record is clear, and as Judge Caproni noted, when Guarandino behaved badly, they took him to task. They reported it to HR. They coached him. They made him apologize, and they fired him. Hantho and Eidenberg indisputably decided to terminate Guarandino's employment, and it's just nonsensical to believe that Abramovich, as one of 14 people who played such a minor role in the Guarandino investigation, the bank would have then hatched a plan over the next 15 months to zero-bonus him and terminate his employment. There's no evidence in the record about any retaliation against any of the other 14 witnesses? No, there's no evidence in the record of that. All that Mr. Abramovich can point to is speculation that Mr. Martara, based on the hearsay statement from Mr. Hantho, was retaliated against by John Eidenberg, who wasn't a decision-maker regarding Mr. Abramovich, but he resigned from the bank in December 2015. I see my time is up. I ask this court to affirm Judge Caproni's decision because Mr. Abramovich has failed to offer evidence from which a reasonable juror could conclude that Deutsche Bank's proffered reasons were false and pretextual and that retaliatory animus was a but-for cause of the complaint of actions. Thank you, Your Honors. Thank you. Thank you, Counsel. Mr. Goodstead, you have a minute remaining. Thank you, Your Honors. I just want to address a few of the points that were raised by the bench as well as by co-counsel. In response to your question, Judge Pooler, about whether the bank identified Mr. Abramovich's participation as being material, in their submission to FINRA, because Mr. Grandiano sued the bank related to his termination at FINRA, in their submission at FINRA, which starts at the record at page A3180, they enumerate a bunch of the reasons why they terminated him. And lo and behold, a large majority of them were the exact same things that Mr. Abramovich complained about in the investigation. Second, in connection with no evidence of other retaliation to the other people who were interviewed, we do have evidence of that. Mr. Mortera submitted an affidavit that claims precisely that he was retaliated against, and it goes back to the SPAC reallocation. Prior to Mr. Grandiano's termination, Mr. Mortera was asked to lead the SPAC business, and nothing changed except for the termination of Mr. Grandiano. And right after that, Mr. Mortera was then told that the opportunity no longer existed. So, and it was brought, and the P&L revenues were then being brought to Mr. Bonzo and Mr. Hackle. Mortera voluntarily left the company, right? I apologize. Mortera voluntarily left. So, Mortera voluntarily left just before Christmas of 2015. But his bonus on all the spreadsheets, and this is highlighted in our papers, was also brought down to zero. The two of them. The two managing directors who were on the team that participated in the investigation, both lost a big portion of their revenue, both were brought down to zero. One was terminated. One left the bank. Your Honor, I have a few more points, but I assume my time is up. I will rest on my papers if you direct me to. Otherwise, I have a few other points that I think are or could be important. Why don't you conclude briefly? Okay. So, Your Honor, in light of the totality of the circumstances, we request that the court vacate the decision below and remand it back down for trial. There is a clear pattern starting immediately after Mr. Grandiano was terminated that started the demise of a 15-year, very good bank employee that resulted eventually in the termination of his employment. And we believe that a reasonable juror can conclude, based on the totality of the circumstances and the litany of contradictory evidence, the shifting rationales, the implausibilities, that they were but for causes of his participation in the investigation. Thank you. Thank you both. We'll take the case under advisement.